486 So.2d 374 (1986)
COCA COLA BOTTLING COMPANY, INC. OF VICKSBURG
v.
Erek Damond Reeves, a Minor, by His Mother and Next Friend, Mrs. Shirley Reeves.
No. 54416.
Supreme Court of Mississippi.
March 19, 1986.
Rehearing Denied April 30, 1986.
*375 Landman Teller, Jr., M. James Chaney, Jr., Teller, Chaney & Rector, Vicksburg, for appellant.
David W. Hall, Riley, Pintard & Hall, Natchez, for appellee.
En Banc.
ROBERTSON, Justice, for the Court, on Parts I-VI; WALKER, Presiding Justice, for the Court, on Part VII:

I.
This products liability action finds a Coca Cola bottler charged with distributing a defective cardboard carton through the bottom of which a bottle fell, shattered, and severely injured one eye of a two year old bystander. The controversy on this appeal centers around the questions of (a) the content of the duty of Coca Cola's bottler and distributor, (b) whether that duty run in favor of one not a customer in the sense of being a purchase, (c) whether the evidence is sufficient to undergird a judgment that, the bottler breached its duty, and (d) whether the jury was correctly instructed regarding the bottler's duty.
We hold that under these facts and circumstances, Coca Cola bottler's duty is measured by Section 402A, Restatement (Second) of Torts (1965), that a bystander is *376 within the scope and protection of that duty, and that the evidence is sufficient unto the day. Because the trial judge erred, however, in granting Instruction P-6, we reverse and remand for a new trial.

II.

A.
Coca Cola Bottling Company, Inc. of Vicksburg ("Vicksburg Coke") is a privately owned corporation. It has a franchise to bottle Coca Cola. Its exclusive territory includes Warren and Claiborne Counties as well as other areas. Exclusive of all other bottlers, Vicksburg Coke distributes to retailers in Claiborne County bottled Coca Cola products in cardboard cartons. In addition to Coke the company bottles and distributes 7-Ups, Dr. Peppers and Barq's to retail outlets. Vicksburg Coke was the Defendant below and is the Appellant here.
Traceway Shopette is a convenience store located in Claiborne County, near Port Gibson. One of its owners is Albert Butler. The shopette sells Coca Cola products it purchases from Vicksburg Coke. Retail customers are allowed to return full cartons of Coke or other beverages in exchange for other cartons, although this practice is not encouraged. Vicksburg Coke has no control over exchanges as they take place.
On May 6, 1980, at approximately 5:00 p.m. Geraldine Smith visited Traceway Shopette with her two nephews, Antwan Reeves, age four, and Erek Damond Reeves, at the time 21 months old. Smith was approximately 23 at the time.[1] Erek Damond Reeves was the Plaintiff below and is the Appellee here.
The proprietor of Traceway, Mr. Butler, and Mrs. Smith had an understanding that she could exchange some drinks. She brought to the store with her a wooden case filled with drinks to exchange for other drinks at the store. While Smith stated that she had Dr. Peppers to exchange for mixed flavored drinks, Henry Banks (the only other witness in the store) testified that the bottles in the wooden case were being replaced with Coca Colas.
While Mrs. Smith was in the process of physically making the exchanges, she lifted from a Traceway Shopette display shelf a Coca Cola carton containing filled ten ounce Coca Cola bottles whereupon one such bottle fell to the floor and broke. Without dispute the glass shattered several slivers of which entered the left eye of Erek who was standing on the floor nearby. Plaintiff's theory of the facts is that what caused the Coke bottle to fall and shatter is that the bottom of the cardboard Coca Cola carton gave way.
The carton of Cokes was approximately two or three feet above the floor itself. The cardboard carton contained returnable bottles. It was a full pack of ten ounce Cokes with the tops on the bottles, although there was dispute whether it was a six-pack carton container or an eight-pack carton container. In any event, Geraldine Smith had picked the carton up off the soft drink rack or shelf and had been holding it for no more than a few seconds when the bottle fell and shattered. No other bottle fell from the container.
Erek Damond Reeves has experienced a serious permanent injury to his left eye. After being treated by a local physician, Erek was placed under the care and treatment of Dr. Donald Hall, Jr., a competent eye specialist, who testified that Erek has suffered what he believes to be less than fifty percent loss of vision in his left eye. Dr. Samuel Johnson, Chief of Opthalmology at the University of Mississippi School of Medicine, testified that Erek had suffered a loss of vision in his left eye of between ninety-four and ninety-six percent *377 and that this impairment would be permanent.
Henry Banks, an employee of Traceway Shopette who was present at the time, testified that immediately after the accident the carton had a hole in the bottom of it and that the sides were torn out. Banks also testified that the carton was wet when he saw it, but that this was due to it having come in contact with the liquid contents of the broken bottle. The carton itself was not offered into evidence and apparently became lost before trial.
Much of the evidence at trial centered around Vicksburg Coke's connection with the cardboard carton. Without contradiction, Vicksburg Coke held an exclusive franchise to distribute Coca Cola products in Warren and Claiborne Counties. This franchise, of course, included distribution of ten ounce Coca Colas in returnable bottles of the type involved here. Vicksburg Coke distributed to various retail outlets, including Traceway Shopette, Coke products in cardboard cartons. Vicksburg Coke's evidence was that all ten ounce Cokes were packaged in eight pack cartons. Plaintiff had originally alleged that the carton in issue was a six-pack carton but at trial showed that the carton was either an eight-pack or a six-pack. The purpose of Vicksburg Coke's evidence was to suggest that any six-pack carton had not come from it. In view of the admitted exclusive franchise of Vicksburg Coke in the Claiborne County area, the only conclusion which could rationally be drawn from the evidence was that the carton in issue had been furnished by Vicksburg Coke. Indeed, there was no credible evidence of any source of the carton other than Vicksburg Coke, in spite of the exchange practice sometimes permitted.

B.
This civil action was commenced on July 11, 1980, when Erek Damon Reeves, a minor, by his mother and next friend, Mrs. Shirley Reeves, filed a complaint in the Circuit Court of Claiborne County, Mississippi, naming Vicksburg Coke as the sole defendant. In an amended declaration filed September 23, 1981, plaintiff alleged that Vicksburg Coke was liable on theories of strict liability in tort, implied warranty and negligence. In its answer, Vicksburg Coke denied the essential allegations of the complaint.
Following trial by jury, judgment was entered in favor of Erek and against Vicksburg Coke in the amount of $52,037.34. Upon motion of plaintiff an additur of $75,000.00 was granted. The additur not being accepted by Vicksburg Coke, a new trial was held on the issue of damages only whereupon the jury determined that the first verdict was not the real thing and this time returned in Erek's favor a verdict of $250,000.00. Final judgment thereon was entered on May 28, 1982. Upon the motion of Vicksburg Coke, a remittitur of $62,500.00 was ordered and accepted by plaintiff whereupon on June 28, 1982, final judgment was entered in favor of Plaintiff, Erek Damond Reeves, and against Defendant Coca Cola Bottling Company, Inc. of Vicksburg, in the sum of $187,500.00, together with interest and costs. This appeal has followed.

III.
Plaintiff's claim rests upon strict liability in tort the contours of which we have articulated generally in a series of cases beginning with State Stove Manufacturing Co. v. Hodges, 189 So.2d 113, 118 (Miss. 1966) and through and including such cases as Ford Motor Co. v. Cockrell, 211 So.2d 833, 836 (Miss. 1968); Falstaff Brewing Corp. v. Williams, 234 So.2d 620, 623 (Miss. 1970); Early-Gary, Inc. v. Walters, 294 So.2d 181, 185-86 (Miss. 1974); Thomas v. Munson Machinery Co., Inc., 463 So.2d 1044, 1046-47 (Miss. 1985); Toliver v. General Motors Corp., 482 So.2d 213, 214-19 (Miss. 1985).
The general rule, which we have borrowed from the Restatement (Second) of Torts, § 402A (1965), is that
one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm *378 thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
To eradicate venerable doctrine from the past, we recognize that this general rule applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
We have recognized in William Cooper and Nephews, Inc. v. P.V. Pevey, 317 So.2d 406, 408 (Miss. 1975); and Early-Gary, Inc. v. Walters, 294 So.2d 181, 186 (Miss. 1974) that
before recovery can be had under this section [402A] three elements must be established by the proof:
(1) that the plaintiff was injured by the product, (2) that the injury resulted from a defect in the product which rendered it unreasonably dangerous, and (3) that the defect existed at the time it left the hands of the ... [seller].
Two nuances of the rule must be recognized in the context of the facts of this case. First, the duty imposed by Restatement § 402A to the extent that same has been incorporated into the positive law of this state exists in favor of anyone who may reasonably be expected to be in the vicinity of the product's probable use and to be endangered by it if it is defective.[2]Ford Motor Company v. Cockrell, 211 So.2d 833, 836 (Miss. 1968); Lovelace v. Astra Trading Corporation, 439 F. Supp. 753, 759, 906 (S.D.Miss. 1977) (citing Mississippi law); Howard v. Sears, Roebuck & Co., 437 F. Supp. 883 (S.D.Miss. 1977) (citing Mississippi law). See also, Elmore v. American Motors Corporation, 70 Cal.2d 578, 75 Cal. Rptr. 652, 451 P.2d 84, 88-89 (1969); and Martin v. Ryder Truck Rental, Inc., 353 A.2d 581, 587-88 (Del. 1976). Therefore, the fact that Erek Reeves may arguably be classified as a bystander avails Vicksburg Coke nothing inasmuch as children accompanying their parents, relatives or persons in loco parentis while shopping or otherwise lawfully on the premises may generally be expected to be in the vicinity of the handling of soft drink cartons and to be endangered if those cartons are defective.
Second, one who sells or distributes as his own a product manufactured by another is subject to liability the same as though he were its manufacturer. Swift & Co. v. Hawkins, 174 Miss. 253, 164 So. 231, 232 (1935); see also Lovelace v. Astra Trading Corporation, 439 F. Supp. 753, 757 (S.D.Miss. 1977) (applying Mississippi law); and Penn v. Inferno Manufacturing Corporation, 199 So.2d 210, 214-15 (La. 1967). Here the carton prominently bore the red Coca Cola color, its logo or insignia, while the identity of the carton's manufacturer could only be ascertained by removing all of the bottles and turning the carton upside down, a step hardly likely to be taken by the average consumer before handling the carton and relying upon its safety.
In this context Vicksburg Coke relies heavily upon our oft criticized decision in Sam Shainberg Co. of Jackson v. Barlow, 258 So.2d 242 (Miss. 1972). See 2A Frumer & Friedman, Products Liability § 19A[1] at 5-225 to 5-226 (1984); Wittenberg, Products Liability: The Law in Mississippi, § 4-7 at pp. 73-75 (1982). In Shainberg this Court held that a retail seller of shoes had no liability for latent defects
if he is a mere conduit of the product which he has purchased from a reputable manufacturer.
282 So.2d at 246
Shainberg thus appears to hold that we will not impose strict liability upon a retailer for marketing a defective and unreasonably *379 dangerous product which causes injury to plaintiff.[3]
It will be recalled that in State Stove Manufacturing Co. v. Hodges, 189 So.2d 113 (Miss. 1966) this Court seemingly embraced the doctrine of strict liability in tort, as that doctrine had been articulated in Restatement (Second) of Torts, § 402A (1965). We have reaffirmed that large step in numerous cases since that time, most recently in Toliver v. General Motors Corp., 482 So.2d 213 (Miss. 1985). The doctrine of strict liability in tort was formulated to apply not only to the product's manufacturer but also "to any wholesale or retail dealer or distributor", Restatement (Second) of Torts § 402A, comment f. (1965), that is "engaged in the business of selling ..." Restatement (Second) of Torts § 402A(1)(a) (1965). Indeed, the primary duty of the doctrine of strict liability in tort is imposed upon "one who sells ..." Restatement (Second) of Torts § 402A(1). [Emphasis added] In this context, our Shainberg holding that the duty is not imposed upon a retailer is anomolous if not irrational.[4]
The Shainberg opinion relies upon and quotes from one of the leading treatises in this area of the law: Frumer & Friedman, Products Liability, § 18.01, pg. 453 (1970). 258 So.2d at 246. The problem is that the section quoted refers to negligence principles only and was never intended to restrict the scope of the strict liability in tort doctrine.[5]
Notwithstanding these problems, the facts of the case at bar are sufficiently distinguishable from Shainberg so that this is not an appropriate case to consider overruling Shainberg. As will be explained below, the evidence in this case is legally sufficient to establish that Vicksburg Coke manufactured the liquid soft drink and placed it in the ten ounce Coke bottles and in turn placed those in the carton in issue, including the Coke bottle which fell to the floor, shattering and injuring *380 Erek Reeves' eye. Vicksburg Coke sold, distributed and physically delivered to Traceway Shopette that Coke bottle and others in the carton in issue which was colored red and bore only the Coca Cola insignia. Vicksburg Coke knew or reasonably should have known that third parties would rely on Coca Cola to the exclusion of all others to assure the safety of not only the liquid soft drink but also the bottle and the carton.
Vicksburg Coke's own evidence explains how it acquires and examines the Coke cartons before using them by placing filled Coke bottles in them. Vicksburg Coke therefore had far greater occasion to inspect the Coke carton than did defendant in Shainberg the shoes there in issue. Likewise the consuming public and others lawfully on the premises would have no reason to rely for the safety of the carton upon anyone other than the original seller of the Cokes, Vicksburg Coke. The point precisely is that the consumer or bystander may reasonably be expected under the facts of this case to rely solely upon Vicksburg Coke. In contradistinction, the Shainberg case proceeds upon the assumption that a reasonable consumer would rely upon the manufacturer of the shoes, Loree Footwear Corporation, to the exclusion of the retail seller, Sam Shainberg Company of Jackson. Vicksburg Coke's reliance upon our Shainberg decision is, accordingly, misplaced.

IV.

A.
Vicksburg Coke assigns as error the refusal of the trial judge to grant its motion for judgment notwithstanding the verdict, see Rule 50(b), Miss.R.Civ.P. This motion, of course, is merely a renewal of the request for a peremptory instruction in its favor made by Vicksburg Coke at the conclusion of all of the evidence and before the case was submitted to the jury.
By this assignment of error Vicksburg Coke seeks our review of the legal sufficiency of the evidence supporting the liability phase of the verdict upon which the final judgment appealed from has been entered. We are urged to hold, as a matter of law, that the liability phase of the verdict may not stand.
Where a motion for judgment notwithstanding the verdict has been made, the trial court must consider all of the evidence  not just the evidence which supports the non-movant's case  in the light most favorable to the party opposed to the motion. That credible evidence tending to support the non-movant's case must be presumed true. The non-movant must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable men could not have arrived at a contrary verdict, granting the motion is required. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the jury's verdict allowed to stand. These principles are stated in cases which are legion in number including but by no means limited to Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1984); City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975).
It is a matter of common sense that the trial judge's determination whether, under the standards articulated above, a jury issue has been presented, should, indeed must, be given great respect here. City of Jackson v. Locklar, 431 So.2d 475, 479 (Miss. 1983). Nevertheless we have recognized that neither jury verdicts nor trial court denials of peremptory instructions or judgments notwithstanding the verdict may change impossibilities into fact nor convert possibilities into probabilities. Elsworth v. Glindmeyer, 234 So.2d 312, 320 (Miss. 1970); Teche Lines, Inc. v. Bounds, 182 Miss. 638, 649, 179 So. 747, 749 (1938); Yazoo and Mississippi Valley Railroad Co. v. Skaggs, 181 Miss. 150, 161, 179 So. *381 274, 278 (1938). A litigant may of right call upon us to review the evidence for legal sufficiency to undergird an adverse verdict, albeit our scope of review is by law limited.

B.
There are three principal material issues of fact with respect to which Vicksburg Coke argues that the evidence, as a matter of law, was insufficient to support a jury finding for plaintiff. These are (1) whether the carton from which the bottle fell was one sold, distributed and delivered to Traceway Shopette by Vicksburg Coke, (2) whether immediately prior to the accident there was a defect in the carton sufficient to render it unreasonably dangerous, and (3) whether immediately prior to the accident the carton was in substantially the same condition as when delivered by Vicksburg Coke to Traceway Suprette. We will consider these points in this order, considering the evidence, of course, in the light most favorable to plaintiff as we are required to do under the principles recited above.
Without dispute, the bottle which fell had immediately prior to the accident been in a cardboard carton colored red and bearing the Coca Cola insignia. Plaintiff's evidence is inconclusive whether the carton was a six-pack carton or an eight-pack carton. The evidence does suggest that the bottle which fell and broke was a ten ounce returnable bottle. Vicksburg Coke emphasizes that it distributed ten ounce returnable bottles only in eight-pack cartons.
The persuasive evidence on this point is the combination of Vicksburg Coke's exclusive franchise in Claiborne County and the uncontradicted testimony that Vicksburg Coke is the only distributor serving Traceway Shopette. These facts alone raise to the certainty level of at least 99 44/100ths percent that whatever Coke cartons were on the display shelves at Traceway Shopette had been furnished by Vicksburg Coke. There is no evidence that this carton may have come from any other distributor, and Vicksburg Coke's suggestion that the carton may have been brought in by a customer is at best rank speculation and conjecture. Applying to the evidence the Paymaster Oil rule, the evidence was more than sufficient to undergird a jury finding that Coke is it and that the cardboard carton from which the Coke bottle fell and shattered, injuring Erek's eye, was in fact delivered to Traceway Suprette by Vicksburg Coke.

C.
The second issue is whether there was sufficient evidence that immediately prior to the accident the carton was sufficiently defective to render it unreasonably dangerous. (Because glass breaks and because persons encountering broken glass are often injured, we trust there can be no controversy but that a carton of insufficient strength and design to lift and hold safely the Coke bottles is unreasonably dangerous.) Here Vicksburg Coke relies heavily on the fact that the carton itself was not introduced into evidence and apparently has been lost. While production of the actual carton in evidence would have been desirable from the standpoint of all concerned, the condition of the carton is a matter certainly susceptible of proof by the testimony of eyewitnesses.
In her trial testimony (introduced via deposition) Geraldine Smith testified unequivocally that the Coke bottle fell through the bottom of the carton. She did not testify in any detail with respect to a post-accident inspection of the carton.
Henry Banks, an employee of Traceway Shopette who was on duty at the time did inspect the carton afterwards and observed a hole in the bottom of it. In pertinent part Banks' testimony was as follows:
Q. Did you see the carton that she picked up?
A. Yes. I did.
Q. Did you look at it?
A. Well, not closely. No.
Q. What did you observe, if anything, about the bottom of the carton?

*382 A. I have to be really sure about this, but the bottom was out and the sides appeared to be torn a little, but I couldn't give you the exact location of the tear because I'm not really sure about that.
Q. All right. Was there  was there a hole in the bottom of that carton?

A. Yes.

[emphasis added]
Then on cross-examination the following colloquy took place between Banks and counsel for Vicksburg Coke.
Q. You're saying that  can you describe exactly what tear you saw in it?
A. Well, I remember the bottom being out and I remember the side being torn but as far as exact location, no.
Q. Was it in the corner?
A. What the corner bottle?
Q. Was it a corner bottle?
A. Yes, sir.
Q. And how high was the rip?
A. I'm not sure.
Q. Was it torn three-fourths (3/4S) of the way up?
A. I'm not sure.
Q. Was it torn half-way up?
A. I'm not sure about that.
Q. What did the tear look like?
A. It was just a tear. I didn't  I didn't really pay that much attention to it.
Q. You didn't pay that much attention to it?
A. No, sir.
Q. And with regard to the hole in the bottom of it, was it a hole that had been cut out?
A. No, sir.
Q. What was  what did it look like?
A. It just looked like it had bursted out.
Q. Did you pick up the carton?
A. Yes, sir.
Q. And none of the other bottles fell out?
A. No, sir.
[Emphasis added]
Significantly there is no testimony that the bottle got out of the carton in any way other than "bursting through" a hole in the bottom of it. And, it is without contradiction that the bottle that shattered had been in the carton when Geraldine Smith picked it up only seconds earlier.
Applying the Paymaster Oil rule, we regard as true the testimony of Geraldine Smith that the bottle did fall through the carton together with the testimony of Henry Banks that he examined the carton afterwards and found a hole or tear in it sufficient so that the bottle had "bursted out", and we view that testimony in light of the obvious need of the carton to be of sufficient strength to hold bottles when handled in the manner this carton was handled. There is testimony to the effect that, if a bottle did go through one of the cartons distributed by Vicksburg Coke, this would have to be due either to worn out edges or the glue of the carton coming apart. Either of those conditions would be an unreasonably dangerous defect within the meaning of our law. The evidence is legally adequate to establish the fact of a defective condition in the carton unreasonably dangerous to persons such as Erek Damond Reeves.

D.
Our final question is whether the carton was in the same condition immediately prior to the accident as when it was delivered by Vicksburg Coke to Traceway Shopette. Before liability may be imposed strictly upon Vicksburg Coke, plaintiff must establish that the carton at the time it was handled by Geraldine Smith had experienced no substantial change in condition from the time it left the hands of Vicksburg Coke.
On this point the evidence, though entirely circumstantial, supports plaintiff with compelling force. We know that the carton filled with ten ounce Coca Colas was sitting on the display rack or shelf at Traceway Shopette in the soft drink section. The evidence reflects that Vicksburg Coke customarily delivers to Traceway Shopette once a week, on Wednesdays. The accident occurred on a Tuesday suggesting the *383 probability that the carton had been in the possession of Traceway Shopette for at least six days before the accident.
The record is silent as to whether the carton in question was handled by customers or store personnel between the time of its delivery by Vicksburg Coke and the time of the accident, but we assume that it had been so handled. Movement of the carton from one point on the shelf to another, or from one shelf to another, either by store customers or store personnel, would be normal use. Products necessarily are expected to withstand normal use. One that will not withstand normal or reasonably to be anticipated handling or use is unreasonably dangerous within Restatement § 402A. Proof of normal handling by customers or store personnel without more would not suggest change of condition because such normal use doesn't change the condition of reasonably safe products.
We note further that there is no proof of abnormal use or misuse of the carton by store personnel, by customers, or by anyone else. We are thus left with the circumstance that the carton at some point prior to the accident  probably six days earlier  was placed on the shelf by a representative of Vicksburg Coke. The evidence further suggests the overwhelming probability that any use to which the carton was put between the time it was delivered by Vicksburg Coke and the time of the accident was normal use, which the carton may reasonably have been expected to withstand without untoward consequence. This circumstantial evidence  of lack of abuse or misuse, of lack of anything other than normal use, and of lack of opportunity for any use or handling at all  is sufficient to allow a reasonable juror to conclude that it was more probable than not that the carton immediately prior to the accident was in substantially the same condition as when it left the hands of Vicksburg Coke. There being as indicated above substantial credible evidence that at the time of the accident the carton was defective, we hold, faithful to Paymaster Oil, that the evidence is sufficient for plaintiff's purposes to establish that the defective condition existed at the time the carton left the hands of Vicksburg Coke.
We recognize that much of what we have said above turns on circumstantial evidence and probabilities drawn therefrom. The probability of the correspondence of the conclusions reached to actual fact has been rendered far more likely by the absence of any credible evidence supporting Vicksburg Coke's view on any of these critical fact issues. To be sure, the burden of proof was and is upon plaintiff. In the present posture of the case, our fidelity to Paymaster Oil does not require that we ignore the absence of any non-speculative evidence at all offered by Vicksburg Coke on these critical fact issues.

V.

A.
Vicksburg Coke next assigns nine errors said to arise out of the trial judge's rulings regarding jury instructions. Five of these assignments complain of instructions given at plaintiff's request and over Vicksburg Coke's objection. Four relate to instructions requested by Vicksburg Coke but refused.
The big picture is important. We have reviewed as a whole the set of instructions actually presented to the jury. While not perfect, these instructions in the aggregate fairly and adequately charge the jury regarding the matters in issue in this case, with the sole exception of the instruction discussed in Part VII below.
Though instructions should be drawn with care so as to state and apply the law fairly and understandably, we have never demanded perfection or technical accuracy where we perceived no substantial likelihood of prejudice. Nelms & Blum Co. v. Fink, 159 Miss. 372, 379, 131 So. 817, 819 (1930); City of Jackson v. Wright, 151 Miss. 829, 836, 119 So. 315, 317 (1928).

B.
The legal mind finds magnetic attraction in redundancy and overkill. It is said that *384 a lawyer never uses one word when two or three will do just as well. In the present context he never tries his case on one theory, no matter how sound, when he can conceive of a second theory which just might get him into trouble.
In cases such as Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 76 (1960) creative lawyers advanced the law of products liability by asserting a theory of implied warranty. In time the implied warranty theory became accepted in this state. Today products liability suits are commonly brought on two implied warranty theories, each deriving from our Uniform Commercial Code, the first being the implied warranty of mercantibility, Miss. Code Ann. § 75-2-314 (1972), and the second being the implied warranty of fitness for a particular purpose, Miss. Code Ann. § 75-2-315 (1972). See also, Miss. Code Ann. § 11-7-18 (Supp. 1985); and Wittenberg, Products Liability: The Law In Mississippi, § 3-4 at pp. 41-44 (1982).
Strong argument may be made that, with the advent of Section 402A of the Restatement (Second) of Torts and the acceptance into our positive law of the doctrine of strict liability in tort, the breach of implied warranty theory of a products liability action should be relegated to the status of an important historical development in products liability law, wholly supplanted by strict liability in tort. But see Miss. Code Ann. § 75-2-715(2) (1972).
Eschewing these notions, however, plaintiffs continued to sue on the alternative theories of strict liability in tort and breach of implied warranty. Particularly in a case such as this a plaintiff creates unnecessary legal complications in a lawsuit and creates substantial danger of reversal when he determines that he must kill the snake more than once.
In this context we consider Vicksburg Coke's next assignment of error which is the trial judge's having granted at plaintiff's requested Instruction No. P-7. This instruction presents to the jury plaintiff's implied warranty theory and reads:
If you believe from a preponderance of the evidence in this case, that the Defendant sold the subject carton with cokes therein to Mr. Butler, the local dealer, then there was an implied warranty that arose in favor of the plaintiff of the merchantability or fitness of the carton for a particular purpose, i.e., to safely hold the bottles; and, if you further believe from a preponderance of the evidence in this case that such implied warranty was breached, proximately resulting in damages to the plaintiff, then you must find for the plaintiff.
This instruction states plaintiff's implied warranty theory. Not being a lawyer and schooled in redundancy, the average juror reading it is likely to have asked how this differs from the rules of law set forth in Instruction Nos. P-6 and D-6, for Instruction No. P-7, though stated in different legalese, says essentially the same thing as the strict liability in tort instructions. The implied warranty theory offered by plaintiff was unnecessarily injected into the case and Instruction No. P-7 was at worst harmless.

C.
Next Vicksburg Coke complains of the granting of two definitional instructions, Nos. P-11 and P-12, which state:
P-11
"Unreasonably dangerous" means that the product did not meet the reasonable expectations of the consumer as to safety.
P-12
A "defective product" means a product that does not meet the reasonable expectations of an ordinary consumer as to the safety of the product.
Vicksburg Coke complains that these two instructions are abstract statements of the law not tied to the facts of this case and as such should be condemned. It is certainly true that this Court has on many occasions in the past criticized the use of instructions stating abstract legal principles. Reversible *385 error, however, has been found only where there is a substantial probability of the jury having been confused or misled. Nielson v. Miller, 259 So.2d 702, 706 (Miss. 1972); Freeze v. Taylor, 257 So.2d 509, 511 (Miss. 1972). On the other hand, where key terms are used in other substantive instructions, instructions defining such terms are commonly granted. For example, we routinely approve the granting of instructions defining such terms as "negligence" and "proximate cause". The terms "unreasonable dangerous" and "defective product" are key terms in other substantive instructions in the case. It was certainly not inappropriate that these terms be defined for the jury. The definitions given, which appear to have been taken from Ford Motor Company v. Matthews, 291 So.2d 169, 172 (Miss. 1974), were essentially correct.

D.
Vicksburg Coke next challenges the granting of Plaintiff's Instruction No. P-14 which reads:
The court charges you that even though the seller or manufacturer of a product has exercised all possible care in the preparation and sale of its product it is nevertheless responsible for an injury received by anyone as a proximate result of a defect in a product that made the product not reasonably safe for the use for which it was intended.
Thus if you believe from a preponderance of the evidence that Erek Reeves was injured as a proximate result of a defect in the subject Coca Cola carton which made it unreasonably dangerous then you must find for Erek Reeves even though you also believe from a preponderance of the evidence that the defendant, Coca Cola Bottling Company, Inc. of Vicksburg exercised all possible care in the preparation and sale of its product.
This instruction  stating in essence that plaintiff need not prove negligence to recover  is said to be inaccurate and incomplete as a statement of the law of strict liability in tort. While in and of itself the instruction does eliminate certain aspects of the law, it has the virtue of emphasizing other aspects of Section 402A and the rules adopted in the cases cited above from State Stove forward. See, e.g., Ford Motor Company v. Matthews, 291 So.2d 169, 171 (Miss. 1974). Vicksburg Coke ignores the fact that there are other instructions granted for each side which fully and accurately explain the law of strict liability in tort. We would have thought it beyond question that it is improper when challenging an instruction on appeal to single it out and consider it in isolation, yet that is what Vicksburg Coke would have us do. The jury in this case was instructed that no individual instruction should be singled out or given undue emphasis but rather that all instructions should be taken and read together. We do the same on appeal, and when we do so, we find no error in Instruction No. P-14.

E.
Vicksburg Coke next complains of the refusal of the trial judge to grant four of its requested Instructions, Nos. D-7, D-9, D-10 and D-14. Without going into detail, the substantive elements of these instructions, with one exception, were fairly and accurately covered by other instructions which were granted and presented to the jury. The great bulk of the matters in Instructions D-7, D-9, D-10 and D-14 must be regarded as redundant in the context of the trial judge's total charge to the jury.
One substantive element requested in these instructions was not so covered. Vicksburg Coke asked that the jury be instructed that, because it was a wholesaler or distributor, it had no duty to inspect the cartons or discover any defect; rather, that it was entitled to rely upon the manufacturer of the cartons and simply utilize them without encountering liability should the carton be defective. Here again Vicksburg Coke relies upon Sam Shainberg Co. of Jackson v. Barlow, 258 So.2d 242, 246 (Miss. 1972). For the reasons described above, we reject this view.

VI.
Next Vicksburg Coke complains that the trial judge erred in allowing Edward *386 Porter to qualify as an expert witness on behalf of plaintiff. Porter was a packaging consultant from Florida. He had substantial experience in the packaging, design and testing of packaging materials both in the Air Force and as a private consultant in civilian life. He demonstrated substantial familiarity with containers made of corrugated fibreboard, wood and chip board.
The properties, structure and characteristics of soft drink cartons were very much at issue here. It may be fairly said that this was an area where scientific, technical or other specialized knowledge would assist the trier of fact in understanding the evidence of determining the issues of fact. Where such is the case, our law recognizes that a witness qualified as an expert by knowledge, skill, experience, training or education (or a combination thereof), may testify thereto in the form of an opinion. Hardy v. Brantley, 471 So.2d 358, 366 (Miss. 1985); Hall v. Hilbun, 466 So.2d 856, 873-74 (Miss. 1985); House v. State, 445 So.2d 815, 822 (Miss. 1984). Within the limits of this rule, the trial judge is necessarily called upon to exercise his sound discretion in determining whether a proffered witness is in fact qualified as an expert. Early-Gary, Inc. v. Walters, 294 So.2d 181, 185 (Miss. 1974). We hold that the trial judge was well within his discretion when he accepted as an expert witness plaintiff's witness Edward Porter.

PART VII
WALKER, Presiding Justice, for the Court Reversing and Remanding.
This is an appeal from the Circuit Court of Claiborne County, Mississippi wherein a monetary judgment of $187,500.00 was entered in favor of the appellee, Erek Reeves, who sustained an injury to his eye when a coca cola bottle feel through a cardboard carton and shattered upon impact. The appellant, Coca Cola Bottling Company, Inc. of Vicksburg (hereinafter Coke of Vicksburg) aggrieved with the lower court's holding has perfected its appeal to this Court.
The incident which resulted in this lawsuit occurred on May 6, 1980 in Claiborne County, Mississippi. On that day Erek, who was two years of age, accompanied his aunt, Geraldine, to the Trace Shopette, a convenience store, to exchange some soft drinks she had purchased earlier that week. Coke distributed coca cola bottled drinks to the store. In making the exchange Geraldine picked up a carton of coca colas (which she did not intend to buy) to move it out of her way so that she could get to the mixed drinks (oranges, grapes, etc.) when one of the filled coke bottles fell through the bottom of the carton, hit the floor and shattered. Erek who was standing nearby sustained a corneal laceration to his left eye caused by a piece of glass from the shattering bottle.
Suit was filed in Erek's behalf by his mother premised on, inter alia, a theory of strict liability in tort.
The appellee offered and was granted, over appellant's objection, Instruction P-6 to assist the jury in its deliberation with regard to appellee's theory of strict liability. We are of the opinion the court erred when it submitted Instruction P-6 to the jury and reverse.
Instruction P-6 reads as follows:
A seller is one who is engaged in the business of selling products for use or comsumption and a seller is obligated not to sell a product in a defective condition that is unreasonably dangerous to the user; and the seller is further obligated not to sell a non-defective product that may become defective and unreasonably dangerous to the user of such product through a foreseeable misuse of such product unless adequate warnings are given to the user to prevent the foreseeable use.
Thus, if you believe from a preponderance of the evidence in this case that the defendant, Coco-Cola Bottling Inc. of Vicksburg, sold the subject Coca-Cola carton and cokes therein to Albert Butler, the local dealer, in a defective condition that was unreasonably dangerous to *387 the customers of Mr. Butler's store and that the subject carton and cokes therein reached the dealer without substantial change in its condition or that the Defendant sold a non-defective Coca-Cola carton and cokes therein to Mr. Butler, the local dealer, that later became defective and unreasonably dangerous to the plaintiff and other customers of Mr. Butler's store through a foreseeable misuse of such carton, then you shall find a verdict for the plaintiff.
The instruction in part informs the jury that a seller is "... obligated not to sell a non-defective product that may become defective and unreasonably dangerous to the user of such product through a foreseeable misuse of such product unless adequate warnings are given to the user to prevent the foreseeable use." P-6 then instructs the jury they shall enter a verdict for Erek upon a finding that Coke sold a non-defective carton of cokes to the owner of the shopette if said carton later became defective and unreasonably dangerous to Erek and other customers through a foreseeable misuse of the carton. There is one glaring fault with the instruction.
The instruction fails to provide the jury a guideline as to what facts would constitute a misuse of the carton, leaving the jury without any guidance as to what misuse was reasonably foreseeable that would render coke liable should such misuse, if any, occur.[1]
This Court has made it clear in many cases that instructions must inform the jury of the facts upon which they may find liability and not be cast in general and uncertain terms.
In Meridian City Lines v. Baker, 206 Miss. 58, 39 So.2d 541 (1949) Justice Hall quoting from McDonough Motor Express, Inc. v. Spiers, 180 Miss. 78, 176 So. 723 (1937) said:
It was the duty of appellee to have the court inform the jury what was necessary to make out the case stated in the declaration. This was not done. There was no obligation on the part of appellant to do it. The jury were left entirely at sea as to what character of negligence was necessary to be proven in order to authorize appellee to recover; just any negligence was sufficient under appellee's instructions, provided it proximately contributed to the collison.
206 Miss. at 84, 39 So.2d 541.
The Court further stated:
The quoted instruction simply told the jury, in general terms, that it was the duty of the bus line to use reasonable care and caution in the operation of its buses so as to avoid injury to others, and it authorized the jury to find against the bus line if it believed from a preponderance of the evidence that a failure to exercise reasonable care proximately caused or contributed to the plaintiff's injury. By this instruction the jury was left to grope in the darkness, without any light to guide them, on the question of negligence of the bus line, and if in the nebulous maze of the wilderness the jury should grasp any act which it felt constituted a lack of reasonable care, it was authorized to adjudge the bus line guilty of negligence. It has been repeatedly held by this court that in negligence cases the instructions must confine the deliberation of the jury to the ground or grounds of negligence alleged and which are supported by substantial proof. (Emphasis added)
206 Miss. at 83, 39 So.2d 541.
In Merchants Company v. Hutchinson, 186 So.2d 760 (Miss. 1966) Justice Inzer in reversing said:
This instruction contains a definition of negligence, but it does not confine the jury to the grounds of negligence alleged and which are supported by the proof. The jury was left free to find any act of Johnson to be negligence. They could have decided that the fact there was a *388 collison was sufficient to find that Johnson was negligent.
186 So.2d at 763.
In S & W Construction Co. v. Butler, 207 So.2d 350 (Miss. 1968) Justice Patterson speaking for the Court said:
The appellant contends that this instruction lacks the degree of specificity required by the decisions of this Court in that the use of the word "negligence" is too general and fails to furnish a guide for the jury's determination of what acts or omissions constitute defendant's negligence. We are constrained to agree and reverse the case. This instruction has been condemned by this Court on innumerable occasions ...
207 So.2d at 351.
In Jones v. Craft, 218 So.2d 727 (Miss. 1969) the Court said:
The giving of these instructions was error. The jury was not told what facts would constitute negligence on the part of plaintiff-appellant. The jury was allowed to determine for themselves what facts would amount to negligence. This was tantamount to allowing the jury to decide questions of law.
218 So.2d at 729.
The rule that instructions must be specific and provide guidelines for the jury to follow as to what acts or omissions would render a defendant liable, is just as applicable in cases couched in terms of strict liability as it is in other cases where the jury is the fact finder. That rule was violated in this case, therefore, the judgment of the lower court is reversed.
Instruction P-6 was also erroneous since it did not limit the seller's liability to facts constituting a misuse, if any, that could be reasonably foreseen. For the reasons stated above, the judgment of the lower court is reversed and this cause is remanded for a new trial.
REVERSED AND REMANDED.
AS TO PARTS I-VI: PATTERSON, C.J., and DAN M. LEE, PRATHER, SULLIVAN and ANDERSON, JJ., concur.
AS TO PARTS I-II ONLY: ROY NOBLE LEE, P.J., concurs.
AS TO PART VII: PATTERSON, C.J., ROY NOBLE LEE, P.J., and HAWKINS and DAN M. LEE, JJ., concur.
AS TO PARTS I-VI: WALKER, P.J., and HAWKINS, J., dissent.
AS TO PARTS III-VI: ROY NOBLE LEE, P.J., dissents.
AS TO PART VII: ROBERTSON, SULLIVAN, PRATHER and ANDERSON, JJ., dissent.
WALKER, Presiding Justice, dissenting to Part IV-D of Majority Opinion.

PART I
I respectfully dissent from that portion of the majority opinion which deals with the issue of whether there was sufficient evidence that the coke carton was unreasonably dangerous when it left the hands of Coke of Vicksburg.
In the case of Early-Gary, Inc. v. Walters, 294 So.2d 181, 186 (Miss. 1974) this Court held that three elements must be established by the proof:
(1) That the plaintiff was injured by the product;
(2) That the injury resulted from a defect in the product which rendered it unreasonably dangerous; and
(3) That the defect existed at the time it left the hands of the (in this case Coke of Vicksburg).
There is no question but that Erek Damond Reeves was injured when the coke bottle fell through the carton. However, there is absolutely not one scintilla of evidence that Erek Reeves' injuries resulted from a defect in the carton which rendered it unreasonably dangerous at the time it left the hands of Coke of Vicksburg.
The majority opinion makes much to do over the statement of Geraldine Smith who said that the coke bottle fell through the bottom of the carton; and, the testimony of Henry Banks that "... the bottom was out *389 and the sides appeared to be torn a little ..." He also acknowledged that there was a hole in the bottom of the carton. The majority opinion further states that there was testimony to the affect that "if a bottle did go through one of the cartons distributed by Vicksburg Coke, this would have to be due either to worn out edges or the glue of the carton coming apart." Again, I would point out that there is absolutely no evidence that the carton had worn out edges or that the glue of the carton was the reason for it coming apart. If we are going to indulge in conjecture, it is just as likely that the carton was an old carton that was brought to the store by a customer exchanging drinks the same as plaintiff's aunt was doing. We can take judicial notice that billions of cartons, similar to the one complained of in this case, are used every year in this country with few mishaps. It would appear that the majority have misapplied the doctrine of strict liability and substituted in place thereof the doctrine of res ipsa loquitur which is that the happening of the event speaks for itself and would not have occurred in the absence of negligence or the exercise of due care by Coke of Vicksburg and therefore liability attaches. I would suggest however that a fledgling lawyer would know that the doctrine of res ipsa loquitur is not applicable to this case.
The majority, after conceding that before liability may be imposed strictly upon Vicksburg Coke, the plaintiff must have proved that the carton at the time it was handled by Geraldine Smith had experienced no substantial change in condition from the time it left the hands of Vicksburg Coke. The majority quite properly pointed out that the accident occurred on a Tuesday suggesting the probability that the carton had been in the possession of Traceway Shopette for at least six days before the accident. I suggest that it could have been there for a month before the accident. The majority then infers from absolutely no evidence presented by plaintiff that all use of the carton and the handling of the carton by customers was purely normal use which the carton should have reasonably been expected to withstand without unwarranted consequences. They then, in effect, pass the burden onto Coke of Vicksburg to prove that the carton was misused in some way to the extent that Coke of Vicksburg would not be liable for Erek's injures; and, since Coke of Vicksburg did not so prove, and, I dare say could not have produced such evidence, that all of this mountain of lack of evidence was sufficient for a reasonable juror to infer that the carton, immediately prior to the accident, was in substantially the same condition as when it left the hands of Coke of Vicksburg. Such reasoning in my opinion is absolutely misplaced and violates every case heretofore dealing with the subject that a plaintiff, even in cases of strict liability, must prove the essential elements of his case by a preponderance of the evidence. That burden of proof cannot be established by a lack of evidence and shifting the burden to the defendant to disprove liability on his part.
If the reasoning and conclusions of the majority opinion constitute the law of this State with reference to strict liability then all that an injured plaintiff must prove in future cases is that he was injured by a product with a defective condition at the time of the accident. He may then completely ignore the rule recognized in Early Gary, supra, that the proof must show that the defect in the product existed at the time it left the hands of the defendant (in this case Coke of Vicksburg), and shift the burden of proof to the defendant to prove that the product was not defective when it left the defendant's hands. This is not the law nor has it ever been.
This opinion makes the manufacturing establishment and retail businessmen sitting ducks for everyone claiming to be injured by an allegedly defective product purchased in this State. I suggest that getting judgments against manufacturers and businessmen, under the majority opinion, will be as easy as "shooting fish in a barrel".

*390 PART II
The majority's discussion of the holding in Sam Shainberg Company of Jackson v. Barlow, 258 So.2d 242 (Miss. 1972) (Part III of majority opinion) will leave the bench and law in a state of confusion as to what the law is in this State with reference to the liability of a retailer for selling a product manufactured by a reputable manufacturer, which, unknown to the retailer, has a latent defect of which the retailer has no knowledge or control. The law announced in Shainberg is that a retailer of merchandise has no liability for latent defects if he is a mere conduit of the product purchased from a reputable manufacturer. Shainberg holds, in affect, that we will not impose strict liability upon such retailer of merchandise for marketing a latently defective and unreasonably dangerous product which causes injury to another. Although the majority acknowledges that it was not necessary to a decision in this case that we review our holding in Shainberg, it spends three and one-fourth legal size pages castigating and criticizing the holding of Shainberg and pointing out wherein it was incorrectly decided. I suggest that most of that discussion was obiter dictum or as some judges and scholars call it "old bitter dictum" which will be hard to swallow when it comes back to haunt us in future cases.
The decision reached by the Shainberg court in 1972, was not out of mistake or ignorance of the law, but was, I suggest, a premeditated decision rendered after a full and complete discussion by an intelligent court for the purpose of protecting retailers of this State from liability where they simply serve as a conduit from the manufacturer to the general public of goods manufactured by reputable manufacturing concerns. In Shainberg the Court said:
Now, getting back to Shainberg-Jackson in the case before us, it would not be reasonable, logical or practical to place on every retail merchant the absolute duty of inspecting for latent defects every article of wearing apparel and every pair of shoes that the retailer might offer for sale. Such a rule of law would make each retail merchant an insurer or guarantor of every one of the thousands of items that he might handle merely as a sales conduit.
Shainberg is the law of this State and has been since 1972. It is good law. If Shainberg is overruled, every corner grocery store, every service station, every optometrist, every clothing store, every hardware store and all other retailers will be subject to being sued for selling a product which has a latent defective condition that makes it unreasonably dangerous even though the retailer has no knowledge of and did not cause such defective condition to exist. For instance, a newspaper that circulates its newspapers to the general public will be liable for injures and damages caused either by chemicals used in its ink or the material and chemicals used in the process of manufacturing the paper upon which the newspaper is printed, if these things cause the newspaper to be unreasonably dangerous and in fact causes injury and damage to one of its subscribers even though the newspaper publisher has no knowledge of the defect.
The majority states that the retailer is not without a remedy and that he can sue the wholesaler or manufacturer to recover for any judgment rendered against him. However, the opinion overlooks the prohibitive cost of litigation that virtually excludes the average small businessman from seeking relief in our judicial system. Even when they are successful as litigants, their net recovery seldom, if ever, makes them whole. It is patently unfair to place the small businessman in such a no win situation.
If this Court allows the unnecessary criticism of Shainberg to remain in its majority opinion, the bench and bar will be thoroughly confused as to the law in this type case.
In my opinion, the judgment of the lower court should be reversed and this cause rendered here.
AS TO PARTS I  VI: HAWKINS, J., joins this dissent.
AS TO PARTS III  VI: ROY NOBLE LEE, P.J., joins this dissent.
*391 HAWKINS, Justice, joining in Justice WALKER'S dissent:
I join with Justice Walker's dissent that to term a cardboard container "unreasonably dangerous" renders these words meaningless.
That any container made from paper is occasionally going to rupture is beyond dispute. Paper sacks, pasteboard boxes may get scratched, abraded or wet and thereby be weakened. Occasionally they are going to tear. They are made that way. Likewise, a glass is going to break if it strikes a hard substance. These are everyday facts of life. Shall we do away with cardboard containers, paper sacks, glass containers? What shall we substitute? Plastic, wood and metal? Or, will the manufacturer and store owner be liable if any glass container is put on a shelf higher than six inches off the floor?
Most assuredly they will occasionally be knocked off the shelf, and just as assuredly break when they strike the floor.
Millions, millions of people daily use glass containers, paper sacks, and cardboard containers. No one pretends they are non-breakable. No doubt each day, throughout these United States, there are a few thousand instances of bottles being knocked from shelves, sacks tearing, cardboard boxes rupturing.
It would make just as much sense to hold the bottling company liable for dispensing its soft drink in bottles, because it certainly can be anticipated they will upon occasion be dropped or knocked from a person's grip, and fall to the floor and break. In this case the defendant could just as sensibly have been sued for selling its product in glass bottles, because this has more to do with the injury than the carton.
These ordinary containers are used billions of times yearly without any harm. Dangerous? Unreasonably dangerous? Indeed.
Why not be candid, and simply say because a bottle may break, or a cardboard container may rupture, we are going to make liability absolute, i.e., the manufacturer is an insurance company for any injury caused from use of its product.
At least, we would not then be doing violence to the English language.
ROBERTSON, Justice, dissenting as to Part VII:

I.
I respectfully dissent from so much of the majority as finds error in Instruction No. P-6 and therefore reverses. In my view, the jury was adequately instructed in the law and the majority's notions that the jury was without adequate guidance is at best an illusion. In my view faithful application of our law to the facts of this case and the course of proceedings below requires affirmance.
Our point of difference revolves around Vicksburg Coke's assignment of error in the trial judge's granting of plaintiff's instruction P-6 which reads:
A seller is one who is engaged in the business of selling products for use or consumption and a seller is obligated not to sell a product in a defective condition that is unreasonably dangerous to the user; and the seller is further obligated not to sell a non-defective product that may become defective and unreasonably dangerous to the user of such product through a foreseeable misuse of such product unless adequate warnings are given to the user to prevent the foreseeable use.
Thus, if you believe from a preponderance of the evidence in this case that the defendant, Coca-Cola Bottling Company, Inc. of Vicksburg, sold the subject Coca-Cola carton and cokes therein to Albert Butler, the local dealer [d/b/a Traceway Shopette], in a defective condition that was unreasonably dangerous to the customers of Mr. Butler's store and that the subject carton and cokes therein reached the dealer without substantial change in its condition or that the Defendant sold a non-defective Coca-Cola carton and cokes therein to Mr. Butler, the local dealer, that later became defective and unreasonably *392 dangerous to the plaintiff and other customers of Mr. Butler's store through a foreseeable misuse of such carton, then you shall find a verdict for the plaintiff.
The primary thrust of Vicksburg Coke's objection to this instruction is the language therein which advises the jury that a seller such as Vicksburg Coke may have liability if its product becomes defective or is unreasonably dangerous "through a foreseeable misuse" thereof. We regard this and the other portions of the instruction as a fair statement of our law, although the word "use" would concededly be preferable to "misuse"[1]. Defectiveness or dangerousness in products is not a concept to be considered and understood in vacuo. Rather these concepts must be understood in the context of foreseeable uses. A manufacturer may not be liable for injuries resulting from abnormal or unintended uses of his product if not reasonably foreseeable but may be liable where the use is foreseeable. Early-Gary, Inc. v. Walters, 294 So.2d 181, 186-87 (Miss. 1975); Ford Motor Company v. Matthews, 291 So.2d 169, 174 (Miss. 1974).
The point seized upon by the majority opinion, Part VII, is even less persuasive than that which Vicksburg Coke argues. The majority grabs ahold of an almost miniscule point and reverses because the instruction "fails to provide the jury a guideline as to what facts would constitute a misuse of the carton... ." For want of a horse it is said Richard III lost his kingdom. Shakespeare, Richard III, Act V, Scene IV, line 7. For want of a definition of the relatively insignificant word "misuse"  see footnote 1, supra  Plaintiff will lose his judgment and be forced to try this case a third time.
As a practical matter, any experienced trial judge or trial lawyer knows that  in the total context of what was submitted to the jury on liability, emphasizing, of course, the aggregate of the jury instructions  the chances that the failure to define "misuse" affected the outcome are one in a million. At most we have a harmless error. See Rule 11, Miss.Sup.Ct.Rules.
The majority's perception of vagueness and lack of guidelines in "misuse" in the end calls to mind Leo Durocher's view of umpires: he never questioned their integrity, only their eyesight.
I respectfully dissent.
PRATHER, SULLIVAN and ANDERSON, JJ., join in this opinion.
NOTES
[1] Mrs. Smith's testimony was presented at trial via a deposition taken in September of 1980. Mrs. Smith died between the time of giving her deposition and the trial in November 1981. Her deposition reflects that she had a blood disease called leukocytosis which was fatal in her instance. She was 23 when her deposition was taken and had evidently been in poor physical condition for several years.
[2] The justness of allowing bystanders to recover on a strict products liability theory is demonstrably greater than is the case with almost any other potential plaintiff, for the bystander is less able to avoid the accident than almost any other. See Landes and Posner, A Positive Economic Analysis of Products Liability, 14 J.Legal Stud. 535, 550-51 (1985).
[3] We followed Shainberg in Parker v. Ford Motor Company, 331 So.2d 923, 925 (Miss. 1976); and sub silentio in Early-Gary, Inc. v. Walters, 294 So.2d 181, 187 (Miss. 1974). We have not relied upon it to furnish the rule of decision in a case in almost a decade.
[4] In the context of general theory of strict liability and our then prior decisions on the matter, particularly Falstaff Brewing Corp. v. Williams, 234 So.2d 620 (Miss. 1970), Professor Frank Maraist and then soon to be Lawyer Rhesa H. Barksdale label Shainberg "astonishing", and suggested that limiting it to its facts would only "add to the confusion". Maraist, et al, Mississippi Products Liability  A Critical Analysis, 43 Miss.L.J. 139, 184 (1972). Shainberg has placed Mississippi in a "distinct minority" in that "almost all other jurisdictions" hold to the contrary, according to Griffith, et fil., The Doctrine Of Res Ipsa Loquitur In Negligence Actions, 48 Miss.L.J. 259, 283 (1977). I Hursh & Bailey, American Law of Products Liability § 4:28, p. 721 (2d ed. 1974) refers to Shainberg as representing "a minority view".

Reading between the lines, Shainberg was likely motivated by a desire to shield retailers from liability which arose without their fault and with respect to which they had no practicable means of protecting themselves. In that era where fault mattered when negligence was the only available theory of recovery in a products liability case, Shainberg would have made sense. In the era of strict liability and Restatement § 402A, the Shainberg view is misplaced as the retailer's relief is found in our indemnity law. Without prejudging the matter, the instant facts suggest the possibility that Vicksburg Coke may have an action for indemnity against the manufacturer of the defective carton or any part thereof which may have been defective. More generally, in the strict liability era, each party from the retail seller on up the chain has a potential right of indemnity (assuming of course that all of the elements of the claim for indemnity are met) against the person or firm who sold the product to him as well as against all others on up the chain to the designer or manufacturer of the product or the component part found unreasonably dangerously defective. See Rule 13(g) Miss.R.Civ.P., for a procedural means sometimes available for asserting such an indemnity claim.
[5] In a subsequent edition, Frumer and Friedman, to our embarrassment, have stated:

It would seem that the [Shainberg] court has confused strict liability with liability for negligence... . With due deference to the [Shainberg] court and with appreciation for relying on this treatise, it should never-the-less be noted that [the section quoted] deals with negligence, not strict liability. While it is true that a retailer is ordinarily under no duty to inspect, strict liability does not require that a supplier be negligent... . All that is required is that he sell a defective product. 2A Frumer & Friedman, Products Liability § 19A[1] at 5-225 to 5-226 (1984)
See also Wittenberg, Products Liability: The Law In Mississippi, § 4-7 at p. 73 (1982). (1982).
[1] It hardly needs saying that any abusive use of a product in a manner unintended by the seller and inconsistent with the customary purpose to which the product is ordinarily put by purchasers of the product will not render the seller liable.
[1] We have been able to find no evidence in the record that the carton was subjected to any "misuse" and in this sense Instruction P-6 is arguably confusing. The instruction states, however, on no less than three occasions that, before strict liability may be imposed upon Vicksburg Coke, the manner in which the carton was handled after it was delivered to Traceway Shopette  whether that handling be labeled "use" or "misuse"  must have been foreseeable. So long as the requirement of foreseeability is a part of the instruction, Vicksburg Coke has gotten that to which it is entitled under the law.